Please support Daniel Broderick of the Federal Defender's Office on behalf of Mr. Southerland. Countess, I'd like to begin by addressing a point that the government repeated in its 28J letter because I think it goes really to the heart of this case. Both mail and wire fraud statutes address two specific crimes, a scheme to defraud or a scheme to obtain money by false pretenses or promises. The district court in this case correctly found that Mr. Southerland's case was tried by the government under the second theory, false statement theory. The joint statement to the jury that was submitted prior to trial even started explained to the jury that the fraud was through false statement prosecution. The jury instructions. Counsel, it struck me that there were two possible cores here, and I'm wondering if you're saying one is out and the other is in. The one that seemed kind of plain to me is fitting the job so cheap that no trucker will take it, but by lowballing, he gets all these $200 deposits. And the thing that struck me as a really clear statement is 98% of the time we succeed at shipping your car in a reasonable time when actually it's only 62%. Are you saying the first one is out because of the theory that was given to the jury, but the second one is in? I'm saying, Your Honor, that actually the first one being the lowball idea, is that what you mean by the first one? Yes. We specifically. Well, running the entire scheme to get people to pay deposits for transportation that in all likelihood will, or not in all likelihood, but to a high degree of likelihood, will not occur. Actually, Your Honor, we spent an awful lot of time at trial addressing that. And specifically what happened was the lowball theory was completely debunked in the sense that the government expert, the person at carrier dispatch, testified that there is no industry standard. The only thing that determines whether a car can be moved is, in fact, whether it's moved. So what we introduced repeatedly as every single count, including every count of conviction, we showed car after car after car that was moved at the lowest price or the lower price. Well, sure, but they showed car after car after car that wasn't moved, or at least not in any reasonable time. That's just a jury issue. What I really want to know is whether the theory could go to the jury. I think that, Your Honor, the theory of the scheme to defraud. Okay. I think the second theory on wire fraud and mail fraud includes two problems. There has to be an underlying scheme to defraud. Okay. That's an element of that theory. And then an additional element that's required for every count of conviction is an additional false statement that the jury unanimously agreed to. So they had to have both. Now, the jury was not asked to specifically identify what they felt was the scheme to defraud or what aspect of it was the scheme to defraud. We know that they acquitted as to somebody who was in exactly the same position of everybody else, exactly the same position. What Your Honor indicated, a lot of the things Your Honor indicated with respect to percentages and the numbers of cars moved was entirely not accurate. Now, I'm jumping ahead of myself, but in the experts of record, for example, let me give you an example that's right out of the papers. I'm not worried about ahead of yourself. I'm worried about jumping into the jury box. Well, jury box, we got into the jury box by the special verdict. That was the point of the special verdict. We needed to know from the jury what exactly did you identify as the jury as the fraud here? What did you say was at fault here? And that's why we used the special verdict. The law of this case is that special verdict, regardless of other cases. Alito. Counsel, in the special verdict form, you're asking for the false statement. Yes. Not for the scheme of the fraud. No. The scheme to defraud, we did not ask them to identify which of the various things the government alleged were parts of the scheme to defraud. So we don't assume that they, in light of the evidence that was there, they were reasonable for them to infer there was a fraudulent scheme here. All that the jury form provides us is the actual false statements that they found. Right. Right. I think we have to assume. There's no question, Your Honor, because of the guilty verdicts. We have to assume that the jury found a scheme to defraud. Well, then you really haven't answered Judge Kleinfeld's question, though, about that second statement, the statement with respect to the 2 percent. Okay. Okay. The 2 percent. With respect to the one count, okay, with respect to the one count identified by the jury, it was in Mr. Scholl's count, that that was in one, an ad, price quote. Okay. It was not, and the argument is that it's not material, because it was an advertisement that was followed up immediately by a written contract. And in the written contract, it specifically said there are no guarantees. Mr. Scholl agreed he read the written contract. He signed it. He understood the written contract. So the 2 percent, and it only appeared, as far as we could see in all the evidence, we introduced every single Internet ad that we had. It only appeared in one in late November of 2003. And that one said 2 percent failure rate in most areas. It did not say, as Judge Kleinfeld said, a 2 percent failure rate. It did not say 95 percent success rate. These were allegations by the government. But it said a 2 percent failure rate in most areas. And there was absolutely no evidence of what his failure rate was in most areas. If we look at how they derived the failure rate, and this is what I wanted to get at, if you look at where they – where the government came up with a failure rate, first of all, he operated his business from March of 2000. That was the testimony. March of 2000. The government showed nothing that happened in 2000, nothing that happened in 2001, nothing that happened in 2002. The government showed this. The government made this very convincing argument, and I'm sure you made this to the jury, but the jury didn't buy it. Well, but my point is the jury didn't buy it because they focused on a false statement that wasn't made. It wasn't false. It wasn't material. And it didn't show – and there's no rational jury could find an intent to defraud. I don't get why a statement that's followed immediately by a contract isn't material. A legitimate inference would seem to be that the statement was the fraud and the inducement that led people to sign the contract.  That no money – no money could be sent unless you read this contract, signed, and agreed to this contract. So a material false statement has got to be a statement that induces someone to part from money. And you couldn't part from money specifically. It was specifically addressed by Mr. Sutherland in his contract. So did the contract – did the contract say with security sales there's always a And it says this is all the statements. Nothing else you've heard outside this prospectus counts and don't invest your money based on anything anybody might have told you outside the prospectus. I don't think the contract in this case said anything like that, did it? Well, it didn't say that language. It had language written by a layman that's awful close to that. It said everything here is governed by this contract. And everybody got the same contract. It was not drafted by a lawyer. You're all right. It wasn't as locked solid as a securities prospectus is. But for determining whether Mr. Sutherland had an intent to defraud, you have to look at his contract and the fact that he required everybody to sign the contract and the fact that he posted Mr. Scholl's car. He posted Mr. Levantovich's car. He posted everybody's car. And not only did he post it, they followed it up. Mr. Scholl, the second witness, the second count, the first count, the Mr. Levantovich, the jury found two false statements that were never made, period. Never made. They were never made, period. Never made to Mr. Levantovich. He never testified to it. None of the documents showed it. You cannot sustain a conviction for a false statement that was never made. So we're left with Mr. Scholl. And Mr. Scholl's contract is exactly the focus that Judge Kleinfeld had. Mr. Scholl's thing said 2 percent failure rate in most areas. And is that false? No. It's not false. Now, the government introduced incomplete, inaccurate, which I fully briefed, statements by a computer expert who went over all of everything else. But what you looked at, the government's own case agent testified. And the case agent showed an actual exhibit. And in that exhibit, the case agent said that it's actually on ER 118 through 135. But if you look at what the case agent wrote up, he went through all the records. The computer files did not correctly reflect his business. So he went through all of his records. And he pulled out all of the canceled contracts that were canceled at the customer's request because they either didn't get the car or something didn't happen that they couldn't move the car. Okay? And what he was left with under his total was 632 cancellations. But even if we look at his total of 632 cancellations and we go to the last page, which is 135, and we work backwards, there are 52 separate orders in the agent's account that were canceled by the customer before the car was even scheduled to be picked up. So that's not fraud. That can't be fraud. He had nothing, Mr. Sutherland had nothing to do with the cancellation of those contracts. It hadn't even come around to lining up a broker yet. So we subtract those from their 632. We're left with a percentage that we don't know what that percentage is, but it's nowhere near the percentage that Judge Feinfeld started with at 60 percent or 70 percent. It's not very hard to do percentages. 632 minus 52, that would be cancellations. And we can discuss later, if necessary, how that relates to the failure rate and how many successful transports. 6,200, I believe. Thanks. So the next question is, if we get that number. It's still a number that's substantially higher than 2 percent. It's higher than 2 percent. As substantial as the eye beholds. It's 112. It's certainly higher. It's 112. Okay. So it is higher. Now, the question is, if that number is higher, okay, one, did Mr. Sutherland know that number? Well, as far as the specific intent, the jury found that when they found the scheme to be a fraud. I disagree with you there, Your Honor. I think what you're saying, if they found the scheme to be a fraud, they necessarily found the specific knowledge and intent of a false statement. I don't think that's true. I'm sorry. Weren't they instructed by the district court in terms of the elements of fraud? Well, they were certainly instructed to do that. What I'm saying is there's no evidence to show that. There's no evidence to support the fact that no evidence to show Mr. Sutherland knew the cancellation. Well, in light of the jury instruction and in light of their finding, they found so. It's a different argument if you're saying there's no evidence in support of that. That's my insufficiency argument. Correct. That's what I started with is my insufficiency argument. That's correct. I don't dispute that the jury found him guilty of three counts. I can't. They did. What I'm saying is the three counts of conviction have to show a rational juror beyond a reasonable doubt, in the light most favorable to the government, that there were false statements, material, and that those statements were made with the intent to defraud. What I'm saying is to Mr. Limantovich, the first two of the counts, they were not they were never made at all. They were not false at all. The jury found, for example, in Mr. Limantovich's two counts, that they said they had begun to work his car when they hadn't. So we look at what the actual evidence showed at trial, undisputed. If you look at the actual evidence, it's, again, on Excerpt for Record, page 49, okay, he was given, Mr. Limantovich was given a tracking number. It's right there on the piece of paper. You can't be given a tracking number if your order hasn't been placed. So the order, so it was actually true. If it had been made, which it hadn't, it would have been true had it been made, because he was giving a tracking number for his car, which is, so the jury found a statement that wasn't made, but it would have been true anyway. So we're left with Mr. And there is no way in the world, there is no way in the world a rational jury could find that he intended to defraud Mr. Limantovich based upon all the evidence of everything he did with his car. He did an enormous amount of stuff with his car. Then we're left with Mr. Scholl. With Mr. Scholl, he was up in upstate New York in November. We had evidence in the record that Mr. Sutherland had moved, in fact, I believe it was excerpt of record 172, he had moved a number of cars from the same location at or below that price, so it wasn't a lowball price, Judge. It wasn't. He'd moved cars before. And also as the lowball thing, it's important. This is why the contract becomes important as well. He didn't set the order. With every one of his clients, including Mr. Scholl and Mr. Limantovich and every customer, he gave you three distinct price options. Each one was specified, and the customer had to pick which one he wanted. So in a lowball price, Your Honor, he would give one price. The customer would come in at that one price. It couldn't move. Then he'd say, aha, let's just up the price. That's not what happened. He gave a discount price that was clearly related. It said specifically time is not important if you pick this one. The next one, the middle rate. That rate was $200 more. That one was for the customers. If you want, if you had to have time, if it was important, pick that rate. So what happened if a customer picked the low rate? Okay. If a customer picked the low rate and the car didn't move, Mr. Sutherland said, as he said in his contract, you can always upgrade with an additional $200, and every cent of that upgrade went to the trucker, not to Mr. Sutherland. But if he knew that there was no way that car was ever going to move at the lowball or the low price? If the government had proved with any evidence, and I'm talking any evidence, that he knew that, then that would be fraud. If the government had proved that he knew he couldn't move this car and he still took that person's money, that would be fraud, absolutely. But there's not even a shred of evidence that he knew that or was ever told that by anybody. He moved 6,200 cars. I'm sorry, he had moved, he brokered the move of 6,200 cars. He's moving cars. Being a businessman that has a little bit too much more than his business can bite off doesn't make it fraud. What makes it fraud is that he's got to want to do exactly what you just said. He's got to want to say to that customer, give me your money, I know we're not going to move your car. That's fraud. Every single person he got, he tried to move their car. Every single car was posted. That's the way every broker does business. Their own expert testifies. It wouldn't have to be an absolute knowledge if he was reasonably inclined to know that most likely the customer is going to be left with the situation of having to upgrade or forfeit their $200 deposit. Right. That's exactly right. If he felt that there was most likely a chance that the customer was going to be out to lunch, I'm not getting it, which is what they charged in the indictment, which is what they didn't show at trial, because they didn't show that. What happened is that as his business grew, he got new employees. The employee that dealt with Mr. Scholl, he actually identified her in his testimony, Molly. Molly testified. Molly said, we tried to move every single car. We posted every single car. Molly, I was on the phone all the time with truckers to try to move these things. It wasn't an effort to defraud people. It didn't move. It didn't move. And, in fact, Mr. Scholl's, the evidence in Mr. Scholl's shows actually his form. The form is in the record of the posting of his car. That's not fraud. That's not fraud. You're down to about three minutes. Do you want to say something? Yeah, I'd like to. I could. Thank you, Your Honor. Okay. Very good. We'll hear from the government. May it please the Court, Matthew Stegman for the United States. And I would like to first address some of the facts discussed by defense counsel. First of all, he pointed out that a customer cannot be given a tracking number unless the order was placed in the system, and that's not true. When a customer enters information into the Sutherland system, he's given a tracking number. That does not mean that the car move was placed in the database on the computer run by Central Dispatch. So absolutely nothing can be done to the car until it's placed in Central Dispatch. Just because the car was placed in the defendant's database doesn't mean any work was done. In addition, the 632 cancellations the defense counsel was talking about, those were just the hard paper files that were placed in boxes by the defendant or his employees. And that was just to corroborate the computer numbers determined by the computer expert that testified that there were 981 vehicles just for the one-year period that were not moved, where the customers paid money and got absolutely no refund. And so the computer records were not moved. Counsel, I'm a little lost on something involving the numbers, and I'm afraid it matters. 981 cars were not moved when? During the one-year period from about November 2002 through, I believe, or December 2002 through November of 2003. It was about a one-year period covering 2003. Okay. How many cars were moved during that period? About 2,000. In other words, 1,000 were not moved, and about 2,000 were moved. The 6,000 I believe defense counsel was talking about was for the two-year period. And I'd like to point out that the 2,000 that were moved, almost none of them were moved within the promised time period. The testimony from the employees was that about 90 percent of the vehicles were not moved on time, and many of those sat for months and months and months, and one even sat for a year with no money refunded. So these were 1,000 people that had moved and were waiting for their vehicles, and they needed their vehicles, and they were out money, and they were out their cars. And not one of these customers, not one of the 3,000 customers, would have contracted with the defendant to move their cars if they had known the truth. They relied on the 95 percent. And by the way, defense counsel pointed out that there was something about one e-mail that referred to a 98 or a 2 percent fail rate. And actually, the defendant personally told Roger Gross that very rarely do we go outside 10 days. The employees and the defendant over and over and over said that this was the cars would be moved within 7 to 10 days. In many of the advertisements and many of the e-mails which were moved into evidence, the defendant's papers said that the date of pickup is performed in 95 percent of orders. In responses to the Better Business Bureau over and over and over, I believe there were about 300 responses to Better Business Bureau, the defendant reiterated, we have a 2 percent fail rate. And he also said that there were relatively few complaints. So this permeated his business was he was explaining to the customers we're on time, almost always on time, and that couldn't have been further from the truth. He was almost 90 percent of the time not on time, and in a third of the cases never even moved the cars that kept everybody's money. I would also like to point out that the law does not require that the jury be unanimous as to any one false statement. And this Court in July of this year, in United States v. Lyons, said that the jury need not be unanimous on any false statement and even discussed whether or not scheme to defraud and scheme to obtain money for two separate crimes is actually one crime. And the Court ---- with respect to those three false statements. I'm sorry, Your Honor. What are the consequences of the three false statements that the jury found for purposes of review? Your Honor, we can look at those three false statements and decide whether or not they were false. We can do that. But I think we can also look at the bigger record, because the jury did not need to decide on one specific false statement. We could look at all the false statements. All right. But they did decide. So what do we do with that? They did. But we shouldn't be limited to those three. But let's discuss those three. Percent of fail rate false. They were referring to Exhibit 4.1. We have, and I'm reading from the exhibit, we have a great on-time record of pickup and deliveries, superior performance with a fail rate of 2 percent or less in most areas. And the evidence was clear. Either the 2 percent fail rate referred to on-time performance or it referred to whether or not they moved the cars at all. And both would have been false. We had the computer records showed that 38 percent of the time, cars were not moved at all. And that so that certainly wouldn't be a 2 percent fail rate in regards to moving vehicles. As to whether or not there was a 2 percent fail rate to moving on time, the computer records showed. Counsel. Oh, sorry. You can finish your answer, and then I have a question. Okay. The computer records showed that 12 percent of the vehicles were moved within 20 days. All the rest were outside 20 days. And 90 percent, according to the employees, Fisher and Caldecott, 90 percent of the vehicles were not moved on time. So either way you look at it, the fail rate was not 2 percent. And there's no way that the jury could have found that in most areas there was a 2 percent fail rate. The numbers were just so huge, the fail rate numbers were so huge, that it doesn't matter if he said in most areas or not. Either way, the 2 percent fail rate was false. Counsel, you said 38 percent fail rate. Plaintiff's lawyer said it's too complicated for us to figure out, but he gave us some numbers that amount to a 9 percent fail rate. Can you account for the difference between your 38 percent and his 9 percent? The defense counsel is referring to the boxes of canceled orders. And that required that the defendant and his employees took the files on canceled orders, when a customer called and canceled, and removed it from the paper, from the plastic, from the area where they kept the pending orders, and put it in the canceled order files. That, first of all, requires that, that they were doing their jobs and actually moving the paperwork. The computer records were accurate, as far as we know. They were the defendant's computer records and accounted for every vehicle. And according to the defendant's own computer records, it was one-third, or 38 percent of the vehicles were never moved. And that gave the defendant, from November through when the business was shut down in January, I believe, at least 45 days to have moved all those vehicles. So the defense counsel argues, well, the government shut the business down. But we didn't take the records all the way up until the date the business was shut down. We looked at the records only through November, giving the defendant about 45 days, I believe, to get the vehicles moved. Certainly plenty of time to move a vehicle that he estimates would be moved in 7 to 10 days. Well, how much variance do you think that it would take to hold that the verdict could be sustained? In other words, if we accept the defendant's figures as a 9 percent fail rate, and you dispute that, and let's assume that's undisputed, do you think that therefore the jury's finding of a 2 percent false representation could be sustained on the record? The government would have to prove to the jury that the defendant knew the difference and intended to defraud. Regardless of the variance. Right. I mean, at 9 percent, it would get tougher. We would have and the but in this case, because we had 38 percent of cars that never got moved, and people never got refunds, and many of them lost $1,200 or however much they paid in full. They lost the full amount, and the cars were never moved. In addition to that, we had 90 percent of people whose vehicles were not moved on time, sometimes sitting for months and months, and the stories that were told by these victims at trial were just horrendous. They needed their cars. They had to make other arrangements. They made phone call after phone call after phone call. They were hung up on. They were cursed out by the defendant. Their stories, these people would not have contracted with the defendant if they had known the truth, that he didn't care if the vehicles got moved or not, and he wasn't going to refund their money when they failed. Why don't you turn to the other two? Is the business? Go ahead. Sorry. Go ahead. No, no, go ahead. Was the business as the, well, let me rephrase that. I could see where it could be a lawful, non-fraudulent business. If you advertised for $200, I will put your name on a computer database that carriers use to look for cars to ship, and you may score, you may not. That would be a legitimate business, even if most people didn't score carrier. I think people do that for less than a full truckload shipments, but here, I gather his assurances to the customers were much more than that, so it really wouldn't do just to take $200, put it on the database, and do nothing more. Have I got your theory right? That's exactly right. And if I may point out in regards to the contract, the defense attorney talks about the contract quite a bit. And the contract doesn't say that these numbers aren't true. What the contract says is that these are approximations, 7 or 10 days are approximate, and that there are no guarantees. And approximate doesn't mean, you know, way off base. Approximate means 7 or 10 days or thereabouts. It doesn't mean 30 days or 60 days, 7 to 10 days. And no guarantees doesn't mean that if we don't do anything to move your car, your car doesn't get moved, you're out of luck. No guarantees means we'll do our very best, but we can't guarantee. So the contract didn't clear anything up for these customers. When the customers signed the contract and sent in the money, they certainly expected performance. Why don't you turn to the other two findings? I'm sorry? The other two findings by the jury. Okay. That's where we started. Already began working his order, and if he didn't pay, they would send him to collections. That was, I believe, in regards to Count 3. And I want to point out to the Court that the false statement need not be in regards to that mailing alleged in Count 3. The scheme to defraud is the entire scheme, and as long as encompassed within that scheme there is a false statement to somebody, that's good enough. And then we have a mailing. And in this case, the false statement, already began working his order, and if he didn't pay, they would send him to collections, was made to May Chen. And that's on page 731 of the transcript. Jilda Caldicott, the employee, was explaining the emails back and forth to May Chen. And she's explaining that May Chen was threatened with collections if she didn't send money. And she was told in that email that we have already begun working your order. And Jilda Caldicott testified to the jury that that was false. In fact, we had done nothing on that order. And we don't do anything on orders until we receive money. So that was clearly a false statement that was made. And then as to Count 10, it's basically the same statement. Said they had placed order to move his car when they had not. And again, employee Caldicott testified that that, in fact, was false. And those statements were made. And it doesn't need to be to Stephen Scholl, who was the – oh, I'm sorry, Walter Levantovich, who was the recipient. And, in fact, they weren't made to him, right? That's correct. So the question is whether or not we can sustain a verdict on a statement that wasn't made to the victim, right? All this – all the law requires and all that the judge required of the jury was that they, as to each count, that they identify a false statement that was made, not that they identify a false statement made to a specific person that received or sent a mailing in that count. And in this case, a specific false statement was made to Mae Chen as part of the scheme to defraud. It was identified. And I will point out that Stephen – Walter Levantovich also was the recipient of one of those e-mails and one of those phone calls threatening him that if he didn't send money, he would be sent to collections. So the jury was correct in finding a false statement made in that regard as part of that – that portion of the scheme to defraud. The – I'll go ahead and address loss amount, if I could. Help me – help me with something on loss amount. That was another question that I had for you. I couldn't figure out the $400,000, frankly. I thought, let's say there are 50 victims and they were all defrauded out of their $200. That would be $10,000. If it were 500 victims all defrauded out of their $200, that would be $100,000. How do you get it up to – I think you've got 600, but you need 400 for the sentence that he got. How do you get it up there? The – his computer system – The arithmetic. His – because many people didn't just lose $200. Many, many of these people sent a full amount of money and didn't get refunds. Well, wait a minute. The computer system, the reference to that in the brief didn't help me at all. I need to know what the computer system said. And most of the time, if I understand the business correctly, if they send, say, $685, $200 or $400 goes to Sutherland and the rest of the money goes to the carrier that chips the car. So it's not part of the loss amount. It's not an intended loss or an actual loss or any loss at all. It's just legitimate payment. Only if there is a trucker who received the money. And the $600,000 was for people whose cars were not moved. So there was no trucker. The defendant kept all the money. And the judge made it in his Rule 32 sentencing order, said it was – the evidence was pellucid that the defendant – that the victims of this crime lost $600-and-some-thousand. And that was based on – Are you saying – are you saying that this is people – the carrier comes through or at least the customer is told the carrier has come through with a bid for, say, $700, so the customer has already paid $200 to Sutherland, he sends Sutherland another $500, Sutherland keeps all $700 and the car never gets moved? That's correct. And that's what adds up to the $600,000? That's my understanding at this time. That's been my understanding, that the computer expert testified that the computer system showed how much money was received. She then looked at which orders were not completed and what money was not refunded. And the total amount of that for people whose cars had not been moved was $604,000. Okay, all for money that was paid to Sutherland and cars that were not moved? Correct. Now, part of that was right at the end when his business was shut down, so – We did not include any of the vehicles that were – where orders were placed after November, sometime in November, and that would have given the defendant at least 45 days to move vehicles. And so he would have had 45 days to move the vehicles, the vehicles hadn't been moved, and by the way, the government never shut the business down. The defendant was arrested and we took files, but that didn't prevent them from getting those vehicles moved. Those vehicles were still listed on central dispatch. His wife was not in custody. His wife was working at the business. There was nothing preventing them from following through on the orders. And in any event, once the business was – Counsel, do you know how much we would take off the total amount of loss found by the district court if we used the date of arrest as a cutoff? I don't think we would remove – I don't think we would reduce it at all because the defendant kept that money. No refunds were given. The government didn't take bank accounts. But once he was arrested, the defendant obviously couldn't do any more work himself to secure these deliveries. Right. And we gave the defendant the benefit of the doubt and did not include in the loss amount any orders that were placed after November, giving him at least 45 days to have moved those vehicles. He didn't move them and he had kept the money. I'd also like to point out the restitution amount ordered was only $27,000. And the reason for that, for whatever reason, the – Judge Burrell took the $200 and multiplied by that – that – by the number of people that had submitted signed restitution requests signed under penalty of perjury, a hundred and some restitution requests. So he did not order restitution for all the money to all the victims, just to the people who had returned restitution requests and then only the $200 nonrefundable deposit amount, not the full amount that they had requested. So there was a large difference, but that's what accounts for the difference. Doesn't the government have a duty to seek restitution for the other people who paid money but their cars didn't get moved? The problem is identifying who those people were. So what we did was we took the list of customers and we mailed out – we being the victim witness office – mailed out victim impact statements and restitution requests to all the victims that we were aware of. And the people that signed under penalty of perjury, how much they lost, because we didn't know how much money people had lost. Right. So, I mean, isn't it sort of contradictory when you – on one hand, you have a loss amount that's calculated by the – by the district court that you think it – under high burden – satisfying a high burden of proof. On the other hand, you're saying, well, we could only find $27,000 worth of loss. It does seem that way. Hard loss that people were willing to sign under penalty of perjury. It does seem that way. And that's why I wanted to bring this up. Because although the computer system could give us an overall amount of money that was taken in and that he didn't refund, the cars that were not moved, we don't know exactly who. We've got numbers. We don't know exactly who. Counsel, whenever you say computer system, to me it sounds like evasion. Computers don't do anything except the very simplest counting to two, actually zero to one is as far as they get. And the woman that testified wasn't an accountant. She was somebody that knew something about computers. So the fact that she says what she thinks, what in her opinion is the bottom line on the accounts doesn't have that much force. I need more explanation, just like Judge Thomas and Judge Larson, of the difference between the 27 and the 604. Okay. We, the defendant's records, which were kept, stored on his computer, showed how many people had paid money and how many cars were actually moved. We could see how many cars were not moved. And so from that information, we were able to determine and prove to the jury and to the defense, we found clearly, by clear and convincing evidence, that the defendant had kept $600 and some thousand dollars from people whose vehicles were not moved. But when it comes down to figuring out who to give a restitution order to, we need specific name of a specific person and a specific dollar amount. That's a little harder to do. And that's why we sent out the restitution request with the victim impact statements, so that we would know how much money to give each person. And how many of those did you send out? How many requests? I believe there were, you know, I don't recall offhand how many were sent out, but I believe it was, I don't want to, I don't recall. It's on the record, probably. Counsel, maybe I'm just being thick-headed. I still don't get that explanation. I assume the witness who ran the computer analysis was taking orders that were placed by individuals who were identified by name and determining how much money they had contributed, determined that they had not received any benefit for their payment, and that's how you came up with the $600,000. The results that she was able to give to us did not break it down by name or amount. She was able to look globally at the total amount of money that was paid. Vehicles were not moved, and money was not refunded. But you get to that global by adding up all the individual payments that were received, correct? The, we did not, no. We had a database where you could run a computer program to add up all the money. But we didn't have specific But the input into that computer database, where did that come from? The defendant and his employees. And they would provide individual? Or over the Internet from a customer. And so we would have order numbers. Well, basically what you were doing was approximating for the revenue received, right? I mean, when you drain all of it away, I mean, it's not that, you can call it computer database or whatever, but it's, you're just running a formula or your best estimate on the revenue received, right? Am I incorrect on that? I wouldn't call it a best estimate. I think it was accurate that the computer system, we were able to tell from the computer database how much money the defendant kept for vehicles that were not moved. Counsel, I'd like you to explain to me, without using the word computer, what that $604,000 represents. These? I mean, I am not going to rely on you telling me what somebody who's not an accountant but knows how to use computers says was the amount taken from customers. I want you to explain to me just how this number was arrived at, without using the word computer. The, whether it was a computer or not, it was the defendant's records. And we had to, I'm not a computer expert, the jury, not a computer expert. You don't have to be a computer expert. Nobody has to be a computer expert. You just have to tell me, one way to do it is, Mrs. Smith paid in $700 to get her car moved. Her car was never moved. Her loss is $700. There are a whole lot of other people just like Mrs. Smith, and when you add up all the numbers in that column, it comes to $604,000. That's, that's exactly right. Another way to do it would be, you take all the revenue that came in, you subtract all the money that went to carriers, and you have $604,000 left over. And you say, how do you get that $604,000 left over? Is it all the $200? Are there enough customers for that to be the sum of all the $200? Or is it something else? And if it's something else, what is the something else? Saying records, computers, you're just telling me, you have no idea, but you're sure that if I did all the work that somebody else might have done, that I would agree with you that that's the number. Actually not. We went into great detail with the expert witness as to how the system works and what numbers she included and how she came up with the total. And she was very clear. Tell us. Tell us, and you've got to be able to do it in 50 words. The first example that you gave, we looked at all the money that was paid by all the customers for vehicles that were not moved and that the defendant did not give refunds. And that total came to over $600,000. And that's corroborated by the 38% for 1,000 vehicles, basically, at $200 is $200,000. And that assumes that only, that the customers only lost the $200 that they paid, which wasn't true. Many of the people lost money. Counsel, you said you take a look at it. And if you don't know the answer to this question, just tell us you don't know. Do you know how those numbers were actually put together? What did, what was looked at, if you want to use that passive tense? Each individual order was not the, our expert witness ran a program that would determine how many people paid money to the defendant to have the cars moved that were not moved and didn't get a refund. And then totaled up that money and the total came to $600,000. I still can't figure out the $27,000 restitution if that's the way the number was derived at. My best guess, I can't imagine people would just say, ah, here's a letter saying I may be able to get my $700 back. I don't care. Throw it in the trash. I don't think that many people would do that. The best explanation I can figure out is either the $27,000 is wrong or the $600,000 is wrong or the government mailed out its notices to the old address instead of the new address. The $27,000. I just can't make sense of it. The $27,000 is wrong. I mean people get their cars moved typically it's because they're moving. So their old address is no good anymore and they've got a new address. The $27,000 is wrong. The restitution amount should have been more like, Anna, should have been about a million dollars because over the two-year period that's how much money the defendant took from people for not moving cars. For loss amount purposes the judge only looked at the one-year period. Well, he took, he took, if I read his order correctly he just took $200 per deposit multiplied by the number of customers. Multiplied by the number of people who submitted loss declarations for restitution. For loss amount it should have been for the one-year period. I'm talking about the loss amount. It looks to me like he just multiplied 200 times 3,600 customers. Am I wrong on that? And then he went on to find that it was intended loss as opposed to actual loss. I think he, my recollection is that he found both. He found the intended loss and the actual loss was over $400,000. Well, he says that he references that the defendant objects because the amount includes satisfied customers and then says, but the law appears to be well settled and a prosecutor of this type the government's not required to prove that he wanted to do fraud to any one customer or any customer sustained loss and that the use of mail included intended customers. The $604,000 that we put into evidence at trial and that the judge relied on was not $200 times 3,000 customers. It was the amount of money paid by customers for vehicles that were not moved and money was not refunded. Okay. Which was the actual loss. You've gone over your time, but I think any further questions, Judge Kleinfeld? Thank you, Mr. Larson. Thank you very much. This is extraordinarily frustrating because this is exactly what I had to do at trial, exactly what I had to do at the district court. Counsel said to you, just like he said to the court, the computer records were accurate. That is totally, completely false. What the computer person testified to, she took a computer program that the person who designed the program testified was inaccurate. She took that program and when somebody there was an order placed by Joe Smith to move a car. If Joe Smith pressed the computer button three times, the computer system reflected that Joe Smith paid his deposit three times. He did not. Joe Smith may not have paid any money. The computer system only showed if somebody pressed the button on the computer. That's all it showed. Period. It didn't show any money. We deal with this in drug quantity and other estimations. So on a review for reviewing for clear error and we say, all right, the system calculation was imperfect, but under the very deferential standard of review, tell us why you think we should reverse the amount. First the loss amount. I'll start with the loss amount. The loss must be attributable to criminal conduct. It is not criminal under any law or facts to accept a nonrefundable processing fee. Period. The loss amount included by the court included nonrefundable deposits from people whose cars were moved. So that is not criminal conduct. Period. Counsel has indicated that this timing thing that somehow cars took ages to move, the phrase that what counsel specifically instructed his expert was to use as the date the person went on the computer, not the date the car was to be picked up. So every single car would be late under his calculus. So time has nothing to do with it. So what loss amount did you tender? My loss amount, Your Honor, the crime here was fraud by the use of false statements. That's what we went to trial on. That's what the case is all about. To this date I have seen one person one person, Mr. Scholl, who can link to what he says is a false statement and an amount attributed to that statement. I do not have one other person and the government has not shown one other person that they can link to a false statement. As I indicated, Your Honor, the statement to Mr. Scholl was in late November of 03. All of the previous ads, all of the previous internets do not make any percentage claim. Period. So let's take it. If the loss is attributable to the scheme rather than the statement and I understand your objection to that, what amount do you think is appropriate for the loss? If he actually went in this I think as Your Honor's question back was knowing he wasn't going to move cars let's say he didn't make any effort just taking people's money right and left and that was his business. It isn't, but if that was his business then what the loss would be is the loss that he, the money that the customers paid him that they didn't get back. And in this particular case what we have is, which the government completely ignores is we have his independent accounting of the money that came in and where it went. You know, this whole computer thing is intended to be deceptive, it is but we have in the record all the money that came in and where it went. When it went to truckers, when it didn't go to truckers. So in that sense and the government has all this they have all this tax returns and everything so the government should have shown he received X amount of money and one of the ones I can point to I think it's ER 167 let me see I want to say 167 for example it specifically says in the income statement trucker payments $1,000,000 or $999,101 so it's out there. Have you done the calculation? No, I didn't, Your Honor and I didn't do the calculations I know you didn't think you needed to, I'm just asking Nobody's done them, certainly he hasn't but nobody's done those calculations and as far as the restitution amount I can't tell you to this day except picking a figure out of the blue because when we got the government's first restitution numbers when you say a victim I think Judge Kleinfeld said somebody has moved his cars maybe they changed the dress we had somebody who sent in a claim as a victim for $300,000 that the probation and the government submitted to the court that wasn't even our case there was a $300,000 claim for restitution that was the wrong case it wasn't even his case so when he's talking about $1,000,000 those numbers have no business whatsoever what I'm most concerned about and because and I'm not going to repeat everything in the brief I think Judge Kleinfeld actually was zeroing in on something that didn't happen at trial I mean the evidence is there so these numbers can be done and everything else but if we want to fit both the concerns that your honors have what we have in the record and I looked for it but I couldn't find it in here I could certainly find it what we have in the record are complaints to the Better Business Bureau now these are complaints that he knew about so these are things that we can actually show he knew about it now the vast bulk of them and I'm talking two-thirds to three-quarters of them occurred after his business was shut down because they couldn't get in contact with him, there's no phones, he's in jail, there's nothing they could do but if you could get a number which is in there, which is in the transcript of the number of better business complaints that occurred in 2003 before his business was shut down we get that number and that's the number we use, these are people who complain now some of these people complained even though their car was moved at least shows he's on notice of something so that number translates, and I guarantee it's going to be less than 9%, now we're getting down we're talking probably a hundred wait a minute, counsel, this is not at least to me at all helpful, I mean a tiny tiny minority of people who've been dealt with abusively by businesses complain to the Better Business Bureau my gosh, I never have I don't even know if they have a local address what would seem useful to me would be for you to tell us how much money Sutherland collected from customers and how much he sent out to carriers over relevant periods of time and I'm sure you must know that, I mean it's so obvious I assume I have it right here, 2002 it's $167 of the ER the income was $1,656,330 that was his income by his independent accountant for that year customer refunds the amount refunded to the customers was $20,183 she already subtracted away we had a total sales of $1,636,147 we subtract from that what your honor just said, trucker payments $999,101 that leaves a gross profit of 2002 of $637,047 then on the very next page, which is ER 168 she breaks down where that money went salaries and expenses, advertising, everything else his expenses for the business that year were $511,887 his net income for the entire 2002 year was $125,160 those numbers are all there now this is, keep in mind that we had a 1.2% refund rate in 2002 so he got what I just read to you in May, his accountant testified in May of 2003 so when he sent the one one and only ad out there that said 2% failure rate in most areas this is what he's working on counsel you're over your time go ahead judge Kleinfeld the $637,000 of 2002 gross profit the worst that the loss to customers from fraud could be I suppose would be the whole thing and the best it could be would be zero and the loss must be somewhere in between is that right? if in fact or no loss because it must be attributable to criminal conduct that's what I said if some of this is attributable to criminal conduct and not just someone paying the $200 which they agreed to then yes, for that year if there was criminal conduct in that year which has been no indication that there was if there was any criminal conduct in that year then it's somewhere less than that figure for 2002 and they have the same records do you want to turn to insufficiency for just a few minutes yeah I would your honor because that's probably the most frustrating thing about this whole thing is that I certainly understand the jury reached the verdict that they did I mean I understand that they found him guilty of three counts but I can only do a trial what any lawyer can do which is try to defend the charges and the government's prosecution and the government prosecuted this case as a false statement case they listed specific false statements in the indictment and we addressed every single one of those with evidence and cross-examination of trial and the jury did not find one single one of those to be false not a single one the government tried to come up with other theories of false statements in their closing argument the jury did not find one single one of those to be false zero so what we're left with is a jury verdict where we ask for a special verdict because the reason we wanted a special verdict is because it was impossible impossible for me to understand how a jury could find a false statement when there hadn't been proof of a false statement so they did and they specifically identified it and that's the law of this case and the law of this case is that two of the counts the jury found false statements that were not made this court simply cannot sustain that verdict which leaves us with one count we spent a lot of time on percentages and we spent a lot of time on everything else but the actual false statement identified by the jury was less than 2% failure rate in most areas we can't just ignore the whole statement it's not fair to Mr. Sutherland it's not fair to anybody that statement has to be false not only does it have to be material and intended to defraud which I do not believe at all existed or there was any evidence that there was any intent to defraud at the time that statement was made or there just isn't but that statement was not false and the government can't show that this court can't find it no one can find it because it's simply not a false statement as far as we know there was absolutely no evidence he moved trucks from New York to L.A. from every part of the country to some other part of the country what that statement says to anybody any rational reasonable human being frankly it's exactly what he said to Mr. Scholl because he testified to this he said if I had gotten my money back which he didn't because the business went under he didn't have any money he didn't get his money back because it was the tail end of the business but he said if I had gotten my money back I just would have assumed that I was in that 2% I was upstate New York near Syracuse in the winter time and there's been no evidence at all as to what the failure rate was in most areas okay counsel could I ask one more question I'm really sorry about this but it's just maybe important to me I was thinking about these 2002 numbers and I'm thinking Sutherland can't make money out of what he pays the truckers unless they give him kickbacks and that's not the case at all no one suggested that the only way he can make money is out of the $200 people give him to place the orders or the occasional $400 or more when they want it expedited I should make it clear he doesn't make any money off the $400 only the $200 he makes no money except the $200 processing fee okay that makes it even simpler then his gross profit of $637,047 in 2002 requires 3,785 customers in 2002 did he have 3,785 customers in 2002 yes he moved 6,000 cars in two and a half years obviously the business got better in 2002 and better in 2003 so yes he had that many people that he moved their cars he moved those people's cars and that's where the money went and I should indicate your honor that of those people despite what the government says those people were happy they got their cars moved but those exact same people that we just talked about the people who successfully had their cars moved who agreed to the processing fee of $200 were all included in the courts loss figure every single one of them that's not criminal conduct thank you counsel the case is heard and will be submitted I want to thank both counsel for argument
judges: Kleinfeld, Thomas, Larson